First, I want to thank Judges Brunetti and Nelson, who are continuing in their senior status years to be of enormous service to the circuit, and we really appreciate that. Secondly, just to remind counsel that if you're saving rebuttal time, you'll need to keep track of your time, because the time that you see includes both your main argument time and your rebuttal time as it works its way down. And thirdly, we'll take a break somewhere around the middle of the calendar. So if you're on the last case or two, you can take that into account. With that, we'll begin with Zurich American Insurance Company v. Whittier Properties. Good morning. May it please the Court, my name is George Lyle, and I represent the appellant Whittier Properties. Joined with me today, I'll be sharing a portion of my time with Justin Smith from the Department of Justice, who will be addressing the proper interpretation of the federal underground storage tank financial responsibility regulations, as well as by Alex Swiderski from the State of Alaska Attorney General's Office, who will be speaking on behalf of the State of Alaska and eight other states on whether or not rescission can be retroactively used to defeat the claims of a government entity or innocent third parties. This is a case in which an insurance company that accepted a premium for the purchase of an insurance policy as a means of providing the federally and state-required proof of financial responsibility, which Whittier had to have in order to continue to operate its state-of-the-art underground storage tank, which was first installed in 1995, now claiming that it should be able to avoid making any payments under that policy to anyone because of an alleged misrepresentation regarding pollution from two prior tanks at the site, which were removed and replaced in 1995. Even though Zurich certified, as it was required to under federal and state law, that its underground storage tank policy only had certain expressly described perspective-only remedies in the event of a misrepresentation, even though Whittier has conceded that those prior two tanks were never covered by the Zurich policy and the Zurich policy specifically provided that it didn't cover those tanks, and even though it is now clear, and this Court has taken judicial notice of this fact, that the source of the over one foot deep of gasoline, which was floating on the groundwater beneath Whittier and its neighbor's property, was in fact... I have a problem. We took judicial notice of that statements that you have in your reply brief. However, the district court hasn't seen that. The district court hasn't put that in the mix, and I don't know that those facts on... Tell me what we do on summary judgment. This was summary judgment below. We're reviewing de novo. District court hasn't taken those facts into consideration. So are you saying we now review de novo and use those facts as true at this point or considered to be true? Yes, Your Honor. That would be my position, given that these are facts which are capable of judicial notice. I believe that... Even if we do consider that, what does it mean? Let's suppose we do now throw that in the mix. What does that mean? What this means, Your Honor, is that Zurich's entire premise, which is that we are asking them to cover a known loss from these prior tanks, which they allege was misrepresented to them, is not true. Well, listen to that. I was hoping you'd go there because I have a real problem that I can't sort out, and maybe you can help me. Okay. As I understand it, the ADEC sent numerous notices to the owner, unresponsive. The final notice said, we're going to do it, as I understand the notice, we're going to take care of the cleanup. They came to the point where they said, we have now made an investigation. It needs cleanup. It needs remedy, and we're going to do it because you haven't done it. I mean, I'm being – I'm not saying exactly what it said, but that's my understanding of the notice and what ADEC does. Two days later, they buy Zurich coverage. Now, that bothers me because if there's a known – if the State – and that also goes to the innocent third party issue. If the State knows about it to the point where they've noticed you many times, the owner, and then says, we're going to clean it up and you're going to have to pay the cost, and then you buy coverage, how can you ever have coverage for that loss? It would be a nice thing that I can see that once you're noticed by the State, you run out and get coverage, misrepresent, and then innocent third parties get the coverage. Well, I would have two responses. First, the coverage was purchased, Your Honor, because federal law required it to be purchased by January 1, 1998. I have no problem with that. But the application said there was no prior contamination when in fact you've been noticed by the State of a contamination and a cleanup requirement. Again, Your Honor, this is where it's significant that the problem today is from the new tank in 1995. Nobody had any idea until February of this year that that came from the new tank. How can you say it's the new tank when the State, before you bought the Zurich coverage, sent a notice that said there's contamination, it has to be cleaned up. We just ignore that? Well, because it's different contamination, Your Honor. In 1995, when the two tanks that were taken out were removed, there was no groundwater free product on the groundwater. But that wasn't the question. The question was whether there was any contamination previously at the scheduled location, not the new tank, old tank, any tank, scheduled location, the physical position. There had been. There was. Your Honor, my client understood that they were buying insurance for the new state-of-the-art tank. They never expected to have insurance. They're not asking for money to clean up the old contamination. That may be true, but Zurich never had a chance to, one, raise your premium, decline the coverage, or require the cleanup before they gave you coverage and they charged you $350. That's pretty cheap to get insurance, where Zurich never had a chance to make a decision on whether they wanted to take that risk. But, Your Honor, if that cleanup had occurred, they would still be paying for that $350 premium for the cleanup from the leak from the new tank. Then we're going to write an opinion that says you can misrepresent what is known or unknown about the previous site, you can pay your $350, and Zurich is going to pay an innocent third party. You don't claim that you get paid, do you? No, we're not claiming that, Your Honor. Okay. So innocent third parties can be covered by just knowing you've got contamination. Lie on your application. Innocent third parties don't know about this. Pay your $350 and you get coverage. That's what we're going to write in this opinion. That may be the United States' position, Your Honor. Our position is that you get coverage for the new tank, which is what the policy covered. We're not asking for coverage. We're not asking Zurich to pay a penny for the old contamination. We're asking them to pay for the risk that they... Tell them what the application says, though. Judge Nelson laid it right out. It said, have you had contamination on the site? We're not talking about tanks, but we're going to write it. You want us to write it that way. But the policy said it only covered the new tanks. So whatever the application said, we're not asking for coverage. The policy doesn't provide coverage for anything but these new state-of-the-art tanks. Let's assume there's a foot of gasoline floating on the water table when you put the new tank in. The new tank puts in another foot. But the evidence, according to the judge, there was no evidence here on how you can sort out what contamination was where. Are you saying now that the new fill is enough for summary judgment to carry that burden to show that there was evidence that it's the new tank that's causing the problem? Your Honor, I think the evidence is undisputed that there was no free product on the groundwater in 1995. That's in the New Horizons report. The district judge did not make any listing of undisputed facts for our summary judgment. We don't make judgment of facts here. Where do I go to find the undisputed facts that support your position? Your Honor, in the New Horizons report, it discusses the fact that there was no free product on the groundwater, and that's in the excerpt of the record, versus the new Marcel Moreau report, which discusses the crack in the fill pipe to the new tank and the continuous leaking that was coming out of there every time they filled the tank up, resulting in approximately 50,000 gallons of loss. And certainly it is not uncommon in environmental circumstances. Courts are asked to do it all the time, to allocate the cost of a cleanup among various parties. This is distinguished from the cases that were cited by Zurich, where they are saying you can't simply take an ongoing loss and split it in time. These are two separate, unrelated events. If we had cleaned up the tank. Well, it becomes an ongoing loss. In other words, if you take 500 gallons of fuel oil and put it in the ground in 1995 and it stays there until 1999 and then you dump 50,000 gallons on top of it, you can't separate them. It's an ongoing, indistinguishable loss. You couldn't divide the cost of cleaning up one from the cost of cleaning up the other. I think that you can divide that cost up, Your Honor, and courts do it all the time. They allocate between. They can base it on the volume of the product. They can base it on the time that it was occurring. It is certainly possible to allocate that. As I say, if we had cleaned it up in 1995, Zurich would still today be faced with having to pay for this cleanup from the new tank. Well, your shifting of the loss argument must then also include the preemption argument, which says then that the mandated insurance requirement that comes down from the federal statutes, which is adopted by the states, trumps the common law right of rescission, which we'd have to say in this opinion, right? I believe that's correct, Your Honor. Also, if we want to go the economic route, which means then we've now shifted the economic loss into the insurance world, which increases our insurance premiums, rather than putting it into the public sector world. These people are going to be bankrupt. They won't pay. States are going to pay, and our taxes are increased. So we're shifting it into the insurance world, right? The cost of this will be shared among underground storage tank owners who are paying the premiums for these rather than shift it to the public. The rest of us pay premiums, whoever it is. Whoever buys these insurance or insurance companies will increase premiums. That's where the economic losses go. Somebody's going to pay for this, either the public through the taxpayer or the parties who actually purchase the fuel who pay for the gas so that the premiums can be paid for the underground storage tank. You and I, when we go to the pump, are going to pay this through our gas price. We're going to pay one way or another. And you're wanting us to shift it in that direction. Because of the federal mandate, and also we now have to also interpret what the federal regulators have said with regard to the statute and the regulations and the requirement for underground storage tank. That's correct, Your Honor. And as to that, I'd like to defer to Justin Smith, if I might, to address those issues. I didn't want to throw this at you, but it's quite a long process to get where you're going in order to get that shift. And we know someone's going to pay, but how we get there is. . . And I think Justin Smith from the Department of Justice will address, the insurance company knew that was the risk they were taking because they certified that their policy only had certain remedies in the event of misrepresentation. And if it's all right, I'd like to turn this over to you. I have one question just to make sure I understand where we were going with the matters as to which we took judicial notice. The significance of that, as I see it, is that there can be very little question but that the Marlowe's are innocent third parties. That's correct, Your Honor. Maybe a real question is whether the State of Alaska is an innocent third party. I don't think there is a question, but if there was a question, there's no question that's the Marlowe's. Does it make any difference? In other words, if there's one innocent third party involved here, the Marlowe's, does it make any difference then in the legal analysis as to whether the State is likewise an innocent third party? I don't believe it makes any difference, and I believe the State is also an innocent third party because they never saw the application. They relied on the fact that the policy was issued and certified that it was issued.  Thank you, Your Honor. Mr. Smith. Good morning, Your Honors. I'm Justin Smith for the United States. I'd like to pick up where my colleague left off. On the innocent third party point, I'd also like to point out that there are several other adjoining landowners in a school. So there's a large universe of parties whose groundwater is being affected by this event. And the U.S. itself has funds that may be drawn on to attempt to clean up this release, and the United States is an innocent third party as well. The U.S. takes no position as to whether there was a misrepresentation here. Our view is that even if there was a misrepresentation, the EPA's regs make it crystal clear that Zurich has undertaken this risk and is obliged to pay for it. And to touch on Judge Brunetti's point, the advantage of assigning this risk to the insurance companies is that the insurance companies are best situated to detect and prevent exactly this kind of misrepresentation. That's what happens in the auto context, where if you apply for an auto policy and you lie, the insurance company finds out about it. EPA, if you look at EPA's Federal Register notice, the regulatory impact analysis found that $2.5 billion of cleanup costs would be avoided because insurance companies would be diligent in investigating insureds. That's how the system is supposed to work. It's what EPA envisioned when it set this system up, Your Honor. Sort of a pseudo Miranda in the insurance business. We're going to punish the insurance companies for not doing due diligence. Well, I mean, the insurance company can raise premiums. In the auto context, it's exact. It's how it works in the majority of states. Well, I can get you. I know where you're going. I get hung up on 40 CFR 280.92, where the definition of termination is described and where the EPA has interpreted that definition of termination, because that goes to the question whether you can trump common law rescission. And what bothers me is when the EPA says that termination includes this situation, it seems as though termination in that regulation seems to say that when you are going to get a termination, you can't have a gap. And so they cover the gap until you get substitute coverage or has obtained substitute coverage with a different retroactive date. How can you have substitute coverage on a void ab initio if you're going to go the same way? So they've pushed that all the way down that line. We're going to say that also if we go your route. Your Honor, it's the term financial responsibility exists, as far as I'm aware, only in two areas, in the environmental coverage cases and in the auto insurance cases. And in the auto insurance cases, courts have taken language that is essentially verbatim identical to the EPA regulations and found that rescission is unavailable for the very reasons I'm laying out. And it's that body of law that EPA had in mind in issuing these very same financial responsibility regulations. The definition of termination refers to non-renewal of coverage, and that's really what's happening here. It's a retroactive non-renewal of coverage that creates an unfixable gap. It's a gap that it's essentially impossible for the insured to address. And that's troubling to EPA, obviously, because the burden of this is going to fall on the public. And in many cases, there's no funding available to remedy these problems. It can be really expensive to clean up these releases, and it's best if the insurance companies do – it's very simple to look on Alaska's website or look at their public records. It's really an hour's work. And find out what's happened at a site. It's what the insurance companies do. In the auto context, it's what any corporation that deals with a contaminated site does as a matter of routine. And we think that it's – essentially, this Court should presume that a responsible insurance company will, in fact, undertake that burden. I'd like to defer to my colleague from the State of Alaska, Your Honors. I just had one question. As I see where we are now, there's no stand-alone way for the United States to enforce its regulation except in this action. In other words, the issue is, is that insurance policy valid? And that's an issue between the insured and the insurer. And that will be decided here, and the United States cannot enforce its regulation independently of this action. Is that right? Well, we're an intended third-party beneficiary, I believe, on a parent-patriarch theory. My suspicion would be that in the absence of this proceeding, the United States might be able to bring its own separate type of proceeding to recover on this policy. But I don't think that after a ruling in this case that the United States or the State of Alaska would feel that it was free to try again, to have another bite of the apple. So this is it for the – there may be other ways to do it with other policies, but this is probably it for this policy, Your Honor. If the regulation is going to be given effect, we have to do it in this case. I believe so, Your Honor. I mean, and I suspect that the adjoining landowners are stuck. I believe there are now two lawsuits pending by adjoining landowners with contamination. And any other – the school, which has had to fill a new well to deal with this problem, any other adjoining party is similarly stuck. I would also assume that there would be collateral – let's assume that the station owner happens to be very, very financially stable, but they're taking a hard line on the insurance. I take it there would be collateral actions against them, whatever that flows out of this. We believe that the only goal of this is to protect the public, and we don't think that EPA's regulation in any way protects a party who makes a misrepresentation. So if that occurs, there's a tort or a contract remedy, or there may even be a partial rescission remedy as to that issue. So, yes, to the extent that Whittier has any resources, they're available to Xerox. We're going to be writing this narrowly, as Judge Nelson has described it. Yes, Your Honor. We'll hear from Mr. Swiderski.  May it please the Court. I'm going to try to be very quick. I see the yellow light is already on. The ruling in the court below in finding that Alaska was not an innocent third party had to have assumed that Alaska must have known that Whittier had failed to disclose the existing contamination. I submit that the record, in fact, supports the opposite conclusion, and it supports it for three reasons. The first is that the 1995 assessment is indicative of really only incidental or minor contamination. What was ADEC doing, sending all these notices which were ignored? And what was ADEC doing when it sent the final notice and said, we're going to clean this up and you're going to pay the costs? Is that innocence? Is that innocent conduct? They knew that there was contamination, or they wouldn't have noticed the owner that they had to clean it up. Your Honor, DEC knew that there was contamination. The DEC sent or received a notice in October of 1995. The following August, 10 months later, they finally sent a series of three letters in a period of three weeks to Whittier telling them, you need to conduct further assessment and, if necessary, conduct cleanup. Six weeks after that, they sent an additional letter. Two and a half years after they received notice, they sent the next letter to Whittier asking them to clean it up. And then more than five years after they received notice, they finally sent Whittier a notice of violation, which is a notification from DEC that you're in violation of the law. And it was in response to that that Whittier finally took action. So, yes, DEC was aware of this contamination, no doubt. Who was satisfied to let this go on year after year after year after year? They're still not innocent. They're still innocent. Well, the innocence comes not with knowing that there was contamination, but with not knowing that there was a misrepresentation. DEC ---- Even in spite of the fact that the State has adopted the EPA rules and knows that there has to be mandatory insurance? DEC knew that there was insurance. DEC sent Whittier and all regulated system owners a letter in July of 1997, which is in the record, telling them that they needed to get insurance. And in that record, in that letter, indicated that you could get insurance even if you had existing contamination at your system. Counsel, would we have to even reach this issue if we were to adopt the position of the United States? In other words, if we were to hold that the regulations preclude the common law right of rescission, what difference would it make whether Alaska's innocent or guilty? You wouldn't reach the issue, Your Honor. Okay. Thank you. Thank you. We asked a lot of questions, so we'll restore two minutes of time for rebuttal when the time arrives. And next we'll hear from the insurer. Good morning. May it please the Court. Dennis Walters for Zurich American Insurance Company. With me is Laura Foggin, who is here for the amicus parties CICLA and AIA. The focus of the arguments today so far have been entirely on the rescission issue, which is only one of the four reasons we believe the summary judgment ruling should be upheld. And I would like to focus first on discussing why it's not necessary to even reach the rescission issue, which I believe most of the arguments I would be making on that have already been addressed by the Court anyway. Before you slide over into that, which there may or may not be issues of fact, I would like to hear your position on to what extent we are obligated to defer to the position of the EPA under our. The deference issue? Yes. It would be our position that this insurance coverage question is an issue of Alaska law and should be resolved under Alaska law. I believe that Bennett v. That's actually not really responsive to my question because maybe I didn't ask it very well. The EPA has interpreted its regulation on termination to also cover rescission and the specific situation at hand and to preempt state law on that point. Are we required to give deference to that view of the federal law as preempting the state law that would otherwise apply? I don't believe you do. And I believe that what the EPA regulations do is require certain terms to be included as part of the provisions of the insurance policy. And it then becomes a matter of Alaska state law to interpret those provisions. Why is that? The EPA has said you must include X in your insurance policy. And now they're saying, and this is what we mean by X. Why isn't that within their statutory mandate and why isn't that a reasonable interpretation? That is what they are saying now. That is not what's part of. I'm sorry? That's my very question. That is what they're saying now. I have not said it before. Does that make any difference? They are saying it now. I believe that goes into the deference question. I think perhaps the broader question is do you ever even get to this deference issue? And I believe that's the main thing I wanted to talk about in my argument is that you never even reach the deference issue. And that is because there is no coverage under this policy for this particular release of contamination. And if I may speak to that, the very basic provision in the policy here provides that there is only coverage if the release of contamination commenced after the retroactive date of the policy. And in this case, the evidence is uncontradicted that the release commenced way long before the retroactive date of the policy. I don't think that the district judge really set that out in his opinion. He did not address that. You are correct. Where do I find this? We are now reviewing de novo. Where do I find these facts that you just say are supported in the record? I believe we have cited them all in our brief. You simply look to the end. The trouble is it sounds like there is a dispute here. Counsel says the reports say that there was none. There was none what? Tell me what's undisputed. All right. Here's what I believe is undisputed. That I don't believe anybody disputes that this property was highly contaminated with gasoline going into the ground for years before the retroactive date of this policy. What's in the record that says that? I believe Whittier has conceded that in its brief. Oh. And I believe that the repeated letters that Here's what I think I remember. The owner's husband dug out the tanks and buried tanks over, quote, contaminated soils. Okay. Digging out some contaminated soil the first time, not digging out soil the second time. Is that an uncontested fact? I believe it is. Okay. Now, how do we know that it was, quote, contaminated to the point where no coverage applies? I don't know that there's any. Once you are contaminated, you take on an obligation to clean up the property under the Alaska regulations. And that is what, I mean, the very claim in this case is the claim by the State of Alaska. This is key to my review. Okay. I think counsel, if I understand Appellant's argument, there was gas or petroleum or whatever you want to say on the water table before the second tank came in. True. And there was even more after the second tank came in. There was an increase. Based on those facts, there's no coverage. Absolutely. Because the release of contamination commenced before, not after, the retroactive date. So is there only one way to interpret release? Is there only one release in the world? I believe there is. Let me finish the question. No matter how many discrete events occur that can be traced to a separate occurrence, there's no such thing as a second occurrence under this policy? I believe that's the case. But in our situation, it would not matter because the second occurrence that Whittier points to as what they call this second release was the what they refer to as the release from the new tank that was installed in August of 1995. The new evidence that Whittier just had this Court take judicial notice of, it's the report regarding the inventory records of Whittier. That report states quite clearly that the contamination, whether it was from the new tank or from some other source, started no later than February of 1997. So that release. The problem of your company, that is, let's say, for the purposes of my hypothetical, that one gallon of petroleum products is spilled onto the site in 1987. And ten years later, a large tank is put in and something happens and 100,000 gallons spill. Even though they have bought coverage for that 100,000 gallon spill, there's no coverage because you can find a gallon that was existing on the property before that. Is that your position? No, I don't think it is. I think you are positing. How is that different in theory from what you're arguing now? Because you're talking about a de minimis situation on the one hand and something of substance on the second hand. That takes us back to Judge Brunetti's question. How do we know that what existed before wasn't de minimis? Because the site assessments that are in the record describe the contamination as extremely high. Levels of both groundwater and soil water contamination high enough that the state of Alaska asserted their or sent their letters to Whittier to require a cleanup. Let me ask another question that's kind of off on the economic side of things. Let's assume that Whittier had told in the application about the letter from the state of Alaska about whatever could be known about that previous contamination. What would have happened differently? Would there have been a higher premium or does the record tell us? You're saying if Whittier had told Zurich? Correct. The record contains some declarations that were submitted on summary judgment on that issue and the evidence was that Zurich would have evaluated that and at the very least if there was a potential willingness to write coverage in that type of situation, then they would have gone to investigate the property to see if they wanted to take on the risk. In our situation, there was never any opportunity to do that because the representation was the property was clean. So your position is that potentially you would never have written this coverage, not just that you would have charged a greater premium? Absolutely, and that is the evidence that was submitted on summary judgment. I guess Judge Graber's question leads me to one. The question of what's a release. If you're looking at this back in the fill pipe, let's say that on January 1st, Standard Oil delivers 20,000 gallons of fuel using that fill pipe. There's a spill as a result into the groundwater. A month later, Amoco comes along and delivers 20,000 gallons. Fuel is leaked into the ground at that point. Is each one of those a release? I don't believe it is once you have already started contaminating the property. Isn't that different? In other words, if you have a tank and you have a leaky tank, once the tank starts to leak, you're done. I believe that's correct. It continues to leak. Exactly, and that's what happened here. Here, if you have a fill pipe, it doesn't leak all the time. It only leaks when you fill it. Isn't each fill a release? I don't believe it is, but there's no evidence to suggest that there was any type of breakup into discrete events of the sort that you're talking about. It seems to me maybe you've got a factual question then if you have a crack in the fill pipe. To me then, when you fill the tank, you get a release, and that would be different than a crack in the tank where you get a release all the time. Is there an issue of fact of what a release is in that factual setting? I believe the way the policy language is worded, the only reasonable interpretation of the policy would be that once you have a substantial release take place, you know, setting aside the de minimis situation, that that is enough to – that tells you when the commencement of the release is. Everything else is just adding to it. What I might add is that Exclusion A of the policy, I believe, deals precisely with the issue that you just raised. And if I could turn to Exclusion A just for a second, I think that is really something that should be dispositive of this case. And, in fact, Judge Beistlein based his summary judgment ruling in the alternative on Exclusion A. Whittier has not addressed Exclusion A at all in its briefing, ignored it in its reply brief, has ignored it here today. But the Exclusion A, I believe, covers the exact situations that all of you have raised here, and because it makes it clear that the sorts of situations where you have a release start, stop, you know, for example, with freezing in the winter, you might have a leak stop because of freezing and then start up again in the spring. But if you look at Exclusion A, it just simply requires two things, that the claim – and, of course, the claim we're dealing with here is by the State of Alaska – that it arise from a release existing before the policy inception. I don't think there's any dispute that that is exactly what happened here. In fact, the State of Alaska said so in its – in the various letters that it sent to Whittier. And the second element of Exclusion A is that Whittier's management, in this case it's Mrs. Baker, could have reasonably foreseen that the release could give rise to a claim. And that's exactly what the evidence shows here. Well, that takes us right back to the question about whether there's one release or two and where the claim arises from. I mean, it seems circular. I don't think that you can win on Exclusion A unless you win on the predicate for Exclusion A. I don't believe so. The way Exclusion A is worded, it talks about a release. If any release takes place, then – and if that release leads the management to believe – to be able to reasonably foresee that there could be a claim, it doesn't matter whether there are sub- Doesn't the claim have to be related to the release for that to make any sense? I believe that would be, but that's exactly what we have here. It is – this is all part of one big body of contamination, so it's related. Well, that's the very issue. That's my point. Unless we buy into your theory that all releases equal one release, or all contamination equals one continuous contamination, then you don't get to Exclusion A. I don't believe that that is a fair reading of Exclusion A, Your Honor. I believe Exclusion A, when you look at it carefully, says that if there's already a release there – and you can understand why from an insurance company's point of view. You wouldn't want to have the type of situation you're discussing here where you've already got a piece of contaminated property, in this case one that we've been told wasn't contaminated, and then write the coverage and then somehow have that leakage stop, start during freezing or whatever, and then have the argument be made, well, now we start coverage because freezing somehow plugged up the tank, and if it starts again, then that somehow triggers coverage. Exclusion A, I believe, takes care of that very situation. Can I explore that a little further? Yes. Your Honor, on summary judgment, the district judge wasn't too helpful in this area at all. Page 7 of the appellant's brief, they list the New Horizons, October 5, 1995, UST closure site assessment. That's the one I think you're referring to where it talks about soil contamination by volatile petroleum hydrocarbons of up to 186 parts per million was found in August of 1995. And that's what you would hang your hat on, would it, for the exclusion A? That's one of a number of pieces of evidence that the contamination was there, sure. And also, I'm talking the facts most favorable to them. If, in fact, this was in – I'd have to go back and check the summary judgment record. They also indicate that report says even though there was groundwater at 9 feet, there was no free product present. Okay? So let's stop right there. No free product present if we're going to rely on that report in October 1995. Now we're asked to take judicial notice of the filled pipe situation after the new tank, and we got free floating product. This goes back to Judge Graber and Judge Nelson's questions. Now, you want us to separate those two out then? I don't believe you need to. But even if you did, the evidence – I have to do something here because you're saying the record supports a exclusion A. Yes. Something that happened before the new tank was put in, right? Correct. So we have to go back to this. What's better – what in addition to this 1995 New Horizons report do we rely on when we write this? Well, there were additional letters from the State of Alaska in 1996 and 97. They didn't rely on this report. They didn't do any independent – they just said – True. And this was the only time – catch me if I'm right on the record. This is the only time that the owner or an agent of the owner or anybody who worked on the tanks notified Alaska was this 1995 report. Alaska, nobody knew anything about it because they kept digging and covering it up, right? I believe that's right, that Whittier did not – This report would be the linchpin. If it's the same one I'm thinking of, I believe you're correct. And in your argument, we'd rely on this and we would say, in your argument, we're not going to worry about the fill tank because we never get to insuring the tank because the site, as described in 1995, was contaminated, put in exclusion A, it's over. I believe you're correct. I don't know if I'm correct. I'm just saying I'm trying to understand your position. Yeah. I have a question going back to where you started, I guess. You said this is a question of Alaska state law. Yes. It looks like the insurance company took the insured to court and said our policy is void ab initio. Correct. And there are two, I guess, two barriers to that potentially. One would be state law and one would be federal law because both of them apply in this situation. Both state and federal law required proof of financial responsibility. True. So why is it only a question of Alaska state law? Why is it also a question of federal law as to whether or not that policy is still enforced? Well, I believe that if there is a conflict between the two, and I don't believe there is because I think you can harmonize the Alaska state statute that requires or provides for the right of rescission to insurers in the event of misrepresentation by simply reading the cancellation regulations not to take away the remedy of rescission. So I believe they can be harmonized and that's under Alaska law. They're required to be harmonized if at all possible. But even beyond that, I don't believe there's been any authority offered here why there would be preemption of any of the federal regulations. Does it have to be preemption? In other words, if they run parallel, and that's the situation where the state has not taken over the program, the federal program runs parallel with the state, you look at what the state says and say, okay, the policy can go away under the state program, but look separately at the federal and say, no, it can't, then isn't the policy still in effect? I believe that to the extent there, which I don't believe there is a conflict between the two, but if you believe there is, I believe state law controls. Why would it control? Federal law always controls. We're the federal government, they say. Read the Constitution. Right. I guess I would rely on the Bennett v. Hedgeland case, which I believe addresses that. The Supreme Court of Alaska basically said a coverage question of this type is a matter of Alaska law. But, again, I don't believe it matters in this case. Is that a case where federal law required the same coverage? In other words, if you have a federal regulation requiring coverage and a state regulation requiring coverage, the fact that the state reads its regulation one way doesn't bind the federal government. I don't see why there has to be a conflict. I don't recall if the Bennett v. Hedgeland case dealt with a federal regulation or not. Okay. But the point I'd like to make along these lines is that Zurich's claim was not just for rescission, but to declare that there is no coverage under the policy. And the arguments I've made here about the fact that the contamination, the release has to occur after the retroactive date and about Exclusion A, those have nothing to do whatsoever with the cancellation regs or the innocent third-party claim. And, in fact, the cancellation regulations specifically provide that they have no impact at all on exclusions or coverage provisions in the policy. Counsel, you have used more than the time allotted to your side, but we have asked a lot of questions. Thank you.  Thank you, Your Honor. I'm Laura Foggin on behalf of the American Insurance Association and the Complex Insurance Litigation Association. The Court has asked a number of questions about the interplay of State and Federal law with respect to the EPA regulations, and I would like to answer them for the Court. What the RCRA statute provides and what the Federal regulations and the analogous State regulations with respect to underground storage tanks provide is as follows. Number one, that insurance may be used as a means of showing financial responsibility. Plenty of other mechanisms that can be used as well, letters of credit, guarantees, et cetera. They do not provide that there is something new, a Federal insurance law or Federal insurance mechanism. They provide ---- The insurance that will be sufficient to show financial responsibility. Your Honor, let me quibble with the language with which you expressed that, because I think it goes to precisely this question. What they provide is that EPA may specify, may specify policy or other contractual terms to be included in the insurance policy. And that's quite different from saying ---- And they have done that. They have specified. And now they have taken a position in this litigation explaining exactly what they meant when they specified. And it's that last thing which is the problem. The first thing they had a right to do, which was specify contractual language that would be included in this well-known vehicle, insurance, insurance policies, which are regulated and governed by State law. And then ---- So what's the problem with having them interpret their own regulations? Isn't that something that we allow agencies to do all the time? They're not interpreting their regulation. They're interpreting the insurance policy. And the question of enforcement of the regulation is a little different than what's presented here. Don't those become the same thing? If EPA can specify a term, they could have specified in words of one syllable exactly the result that they're asking for. Thou shalt not rescind. Okay? They could have specified that precisely. So they specified it in a potentially ambiguous way, but now they're telling us what they meant. What's wrong with that? There are several things that are wrong with that. First of all, I don't believe they did specify it. I believe that the definition of termination, et cetera, makes clear that it's limited, gaps in coverage, not applicable here. Secondly, their administrative practice and the history of the application of these kinds of regulations is directly counter to the concept that they decide what those words mean under State law in an insurance policy when an insurance policy has been issued containing them. And, in fact, Addendum B to the United States brief includes the regulations where the amendment regarding the 10-day versus 60-day cancellation period is included. And in there is another provision regarding the retroactive date where what did EPA do when there was a problem with the potential interpretation of its earlier language? It didn't say our earlier language with respect to retroactive date coverage controls and preempts anything in the State law. It said we will act to change that language, to add language into the regulation to provide for a meaning. And that's precisely the remedy that's available to the EPA here. That particular attachment really interests me because it also, the EPA recognized the fact that if they didn't straighten this out, that the insurance companies would pull out of the State, which got back to our original discussion with Appellant's counsel about where the burden should fall. If we write these things away, should we take into consideration these so-called insurance crises that happen in lawyers, doctors, whatever? Are we walking into an insurance crisis here? Is that what you're telling us? Your Honor, I think that if you came to the point of discussing a public policy exception, which is the only means by which I believe the cancellation remedy could be overridden, then all public policy considerations would appropriately be considered by the Court. And incidentally, it's quite clear that the effect of the approach requested is simply to increase costs and to unnecessarily increase costs because the EPA was sure worried about that 10-day because the industry came up and said we're not going to carry this for 60 days. And that's a big economic issue. This other one is a huge economic issue that we're deciding, way greater than that premium issue. Absolutely. Huge. And EPA has already expressed a strong public policy interest in the availability of coverage and the affordability of coverage for underground storage tanks. Right. And hasn't EPA trumped that? They've now interpreted their statute and said we're going to shift the burden. We're now going to say that termination includes this issue. I don't believe they have because, first of all, their interpretation of the statute is flatly inconsistent. Statute, I beg your pardon, the regulation, Your Honor, is flatly inconsistent with the definition of termination under the regulation which specifies gaps in coverage which means certain things about how one policy interacts with a replacement policy. It does not mean the absence of coverage. The absence of coverage is not something that the EPA regulations abhor. And everybody failed. The State failed by letting this go for many years. The insurance company failed by not doing due diligence, and the owner lied. So everybody failed, and now we've got to place the laws. The owner lied, and under Alaska common law and Alaska statutory law, which beyond the common law specifically evidenced an Alaska public policy interest in rescission, the insurer had a right to rely on the truthfulness of the statements in the application. And, in fact, the evidence in the record, and it's the declaration You've more than used up the time that you were allotted originally. So if you'd wrap up in a sentence, we'd appreciate it. Thank you, Judge. The evidence in the record makes clear that the purpose of the inquiry on which the lie was made was to determine whether a complete site assessment would be required for underwriting. In other words, the insurer had the right to rely on the truthfulness of a statement under Alaska, clearly under Alaska law. Thank you, counsel. Thank you. And I don't know who's going to rebut. Just a few quick points, Your Honors. First on the question of whether there might be an insurance crisis. There's been something like 60 years of experience in the auto context with a similar regime, which precludes rescission. I know you argue that, but what's going to happen is if we go this other route, all you're saying is the public shouldn't suffer this loss. That's all you're saying. Your Honor, we think it's very unlikely that there will be a pattern or a big problem, a big pattern of these types of misrepresentations occurring. From the limited experience we've seen in the auto context, there's very little of it going on over 60 years. And in the unlikely event that there is a problem, EPA has acted once to tinker with its regulations to maintain the availability of insurance and can do so again. We think it's a long shot that there would be a serious problem. Your and our resources of prediction are finite. And should there, in fact, be a problem, EPA is committed to maintaining the availability of insurance in this area and can fine-tune as needed. We also emphasize that the insurance companies are very well-situated to protect themselves. This was an extremely low premium, and insurance companies can charge higher premiums. But what would a – in your experience, and I know this isn't in the record, but it's just my curiosity, I guess. In your experience, if a landowner or operator had revealed the existing contamination, would insurance have been available? And if so, what would be the magnitude of the differential in premiums? I can answer the first question, which is if there's a cleanup and there's a thorough site assessment, then it's our belief that there are insurance companies out there that are willing to insure a site that's been vetted. The insurance industry is pretty mature now, and they're ready – they're able to classify even these types of risks. On the second question, I think it's very hard to predict exactly what the premium difference would have been. I think it really depends. It's very fact-specific. But pollution coverage can be quite costly, certainly. So there might have been a significant difference in premium. If I could just quickly enter into the exclusion A question, which is something of a – makes my head spin. It's something of a morass. We can divide it into several different categories of release. We think it's uncontroverted that Zurich doesn't have to pay for any releases that existed when the tanks were replaced. That's clear. If Whittier had known about the leak in the new tank fill pipe, then potentially exclusion A could have applied. It refers to releases, and it refers to releases from the new equipment. And so EPA said that insurance companies are not supposed to insure known losses. And if Whittier had known about an ongoing leak, that would have been a different situation. Here we have yet another fact pattern, which is Whittier didn't know about an ongoing leak. But Whittier did know about some historical contamination, which we believe the record is equivocal on exactly how serious that was. The report in the record talks about the deficiencies in the samples that were taken. So it's really hard to be sure whether it was de minimis or more. It's really a question of – it's really quite analogous to someone applying for an auto insurance policy and not telling the insurance company about having had an accident a couple years ago. That's really closely analogous to what's happening here. It's a fact that's relevant to assessing the competence of the policyholder or the management of the policyholder, but it doesn't tell you anything about what's actually going on. It doesn't tell you about an existing leak at the property. On the preemption question, Your Honor, we'd point out that there are three different ways of looking at this legal question. You can use EPA's regulations to interpret the policy. You can use them to interpret Alaska law. And then you can use them on their own face to preempt Alaska law. We think that's – the Court doesn't need to go there because the first two mechanisms are sufficient to resolve this problem. But we do think that EPA's interpretation of its regulations are clear. If there are no further questions. Thank you, counsel. The case just argued is submitted, and we appreciate the preparation and arguments of all the parties. It's been very interesting and very helpful. We'll next hear argument in United States v. Slaughter. And you did receive the 28-K materials.
judges: Brunetti, Tg Nelson, Graber